United States Courts
Southern District of Texas
F I L E D

APR 0 8 2021

Nathan Ochsner, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS (Houston Division)

| | |
|---|---|
| **CHELSIE CIERRA RUBIN and CAMERON DAISHAUN JANUARY, personally, and as the Personal Representatives of the ESTATE OF PAMELA SHANTAY TURNER,** | **No.  2 1 CV 1 1 4 8** |
| **Plaintiffs,** | **District Judge:** <br> **Magistrate Judge:** |
| **v.** | |
| **JUAN PEDRO DE LA CRUZ, CITY OF BAYTOWN, TEXAS, CYPRESS POINT EQUITY PARTNERS, LLC,** | **CIVIL ACTION – LAW** <br> **JURY TRIAL DEMANDED** |
| **Defendants.** | |

---

## COMPLAINT

---

**AND NOW** come the Plaintiffs, CHELSIE CIERRA RUBIN ("RUBIN") and CAMERON DAISHAUN JANUARY ("JANUARY"), personally, and as the Personal Representatives of the ESTATE OF PAMELA SHANTAY TURNER, by and through their counsel, DEVON M. JACOB, ESQUIRE, of the law firm of JACOB LITIGATION, INC.; and BENJAMIN L. CRUMP, ESQUIRE, of BEN CRUMP LAW, PLLC; to aver the following:

### I.  JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. § 1983.

2.     Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

3.     Venue is proper in this Court, as the cause of action arose in the Southern District of Texas (Houston Division).

1

## II. **IDENTIFICATION OF PARTIES, DECEDENT, AND SURVIVORS**

4.     Decedent, PAMELA SHANTAY TURNER ("TURNER"), was an adult female, who on the date of her death, resided in Baytown, Harris County, Texas. TURNER was born on April 8, 1975, and was killed on May 13, 2019.

5.     Plaintiff, CHELSIE CIERRA RUBIN ("RUBIN"), is an adult female who lives in Houston, Harris County, Texas. RUBIN is TURNER'S biological daughter.

6.     Plaintiff, CAMERON DAISHAUN JANUARY ("JANUARY"), is an adult male who lives in Houston, Harris County, Texas. JANUARY is TURNER'S biological son.

7.     Defendant, JUAN PEDRO DE LA CRUZ ("DE LA CRUZ"), is an adult male who during all relevant times, was employed by the City of Baytown, Texas, as a police officer. All of Defendant DE LA CRUZ'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

8.     Defendant, CITY OF BAYTOWN, TEXAS ("CITY"), owns and operates the Baytown Police Department. City Hall is located at 2401 Market Street, Baytown, Texas, 77522. The Baytown Police Department is located at 3200 N. Main Street, Baytown, Texas, 77521.

9.     Defendant, CYPRESS POINT EQUITY PARTNERS, LLC, ("CYPRESS POINT"), during all relevant times, owned and managed The Brixton Apartments ("Brixton Apartments"), 1601 Garth Road, Baytown, Harris County, Texas, 77520. CYPRESS POINT has a registered principal place of business of 2000 Bering Drive, Suite 455, Houston, TX 77057. CYPRESS POINT'S registered agent is Terry Turner, 4212 Gibson Street, Houston, TX 77007.

### III. MATERIAL FACTS

#### A. Background

10.     In May of 2019, CYPRESS POINT EQUITY PARTNERS, LLC, ("CYPRESS POINT"), owned and managed The Brixton Apartments, located at 1601 Garth Road, Baytown, Harris County, Texas, 77520.

11.     CYPRESS POINT employees managed The Brixton Apartments.

12.     In May of 2019, JUAN PEDRO DE LA CRUZ ("DE LA CRUZ") was dual employed by CYPRESS POINT and the CITY OF BAYTOWN, TEXAS ("CITY").

13.     Specifically, DE LA CRUZ was employed by CYPRESS POINT as a security guard for The Brixton Apartments, and by the CITY as a police officer.

#### B. TURNER Harassed by CYPRESS POINT Employees Because of her Disability

14.     PAMELA SHANTAY TURNER ("TURNER") was born on April 8, 1975, and in May of 2019, was 44 years old.

15.     TURNER has two biological children – a son, CAMERON DAISHAUN JANUARY ("JANUARY"), and a daughter, CHELSIE CIERRA RUBIN ("RUBIN").

16.     In 2018, TURNER moved to The Brixton Apartments to be closer to her family and to be reunited with her dog.

17.     It was generally known to staff and residents at The Brixton Apartments that TURNER suffered from mental illness.

18.     TURNER liked to go to The Brixton Apartments' office to partake in the coffee that was available to residents.

19.     The Brixton Apartments' manager, however, harassed TURNER because of her mental disabilities.

20.     Specifically, the manager made fun of how TURNER spoke, told her to stop coming to the office for coffee, told her that her rent had not been received (after her rent had been paid), threatened to have her evicted, and sent DE LA CRUZ to her apartment to harass her.

### C.    CITY Police Officers Placed On Notice Regarding TURNER'S Disability

21.     On several occasions, TURNER complained to family about being harassed by police officers who she believed were employed by the Baytown Police Department.

22.     TURNER advised family that on or about December 4, 2018, police officers arrested her and transported her from Baytown, Texas, to a location in Houston, Texas.

23.     TURNER reported that the police officers dropped her off at a location in Houston, Texas, for the purpose of obtaining mental health treatment.

24.     The officers did not notify TURNER'S family about her arrest.

25.     TURNER reported that the facility where she was brought did not accept her for treatment and that the police officers did not provide her with a ride home.

26.     TURNER further reported that as a result, she had to hitchhike home.

27.     On December 5, 2018, a member of TURNER'S family called the Baytown Police Department and inquired about the department's policy for handling mental health incidents.

28.     The family member asked why TURNER had been left with the impression that officers were harassing her, why officers had not contacted TURNER'S family, why officers had placed TURNER in a situation where she needed to hitchhike home, and warned the call-taker that in those types of situations, if anything happened to TURNER, the police officers would be held accountable.

### D.     TURNER Meets DE LA CRUZ

29.     TURNER reported to her family that she believed that a police officer lived in the building.

30.     TURNER referred to the officer as "robocop," and said that the police officer harassed her on behalf of the apartment manager.

31.     TURNER was terrified of the officer.

32.     On one particular occasion, the officer came to her apartment and left her with the impression that he wanted to kill her.

33.     TURNER described the police officer as a Hispanic male, wearing a grey shirt, khaki cargo pants, and a gun.

34.     The man identified himself as a police officer and had his hand on his gun during the conversation.

35.     TURNER reported that she told the officer that she was in her home, minding her own business, and asked him why he was bugging her.

36.     TURNER said that the police officer told her that he was investigating a noise complaint, and that if he had to return to her apartment, the apartment complex was going to have to "put her out."

37.     Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

        a.     DE LA CRUZ was the police officer – "robocop" – who came to TURNER'S apartment.

**E.  Manager Provokes Confrontation that Results in TURNER'S Arrest**

38.     During one of the incidents involving the manager of the apartment complex harassing TURNER, TURNER allegedly broke the manager's glasses leaving a scratch.

39.     As a result, TURNER was charged with misdemeanor criminal mischief and assault.

40.     When TURNER failed to appear in court, two arrest warrants were issued for the low level offenses.

**F.  RUBIN Speaks With DE LA CRUZ**

41.     RUBIN received a telephone call from a male who requested a return call.

42.     When she returned the call, a male answered the telephone and identified himself as a police officer who was employed by the Baytown Police Department.

43.     The police officer was rude.

44.     The police officer complained that he was on his days off and wanted to be spending time visiting with his family, not speaking with RUBIN.

45.     The police officer stated that he wanted to have TURNER involuntarily committed for a mental health evaluation, and that he needed a family member to speak with medical personnel.

46.     Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

       a.     DE LA CRUZ was the police officer who spoke with RUBIN.

### G. **CYPRESS POINT Employees Threaten to Put TURNER on the Street**

47.     In May of 2019, the manager of The Brixton Apartments notified TURNER'S family that they intended to put TURNER on the street.

48.     The family advised the manager not to do so.

49.     The family further advised the manager that arrangements would be made to move TURNER out of her apartment within the week.

### H. **DE LA CRUZ Attempts to Move TURNER to Jail to Solve Eviction Problem But Instead Shoots and Kills TURNER**.

50.     On May 9, 2019, a Writ of Possession was issued authorizing TURNER to be evicted from her apartment.

51.     The Writ of Possession indicated that at any specified date/time at least 24 hours after proper posting of a warning on the outside of her apartment door, TURNER could be evicted.

52.     A document indicates that on May 13, 2019, at 12:50 PM, TURNER was served with an Eviction Notice.

53.     On the same date, at around 10:40 PM, DE LA CRUZ just happened to be "patrolling" the parking lot of The Brixton Apartments, near TURNER'S apartment building, when TURNER arrived home.

54.     DE LA CRUZ also just happened to know that the low level warrants existed for TURNER'S arrest.

55.     DE LA CRUZ announced over the police radio that he was out with TURNER.

56.     DE LA CRUZ intended to place TURNER under arrest pursuant to the arrest warrants and transport her to jail.

57.     Doing so would resolve CYPRESS POINT and DE LA CRUZ'S problem of where to send TURNER when she was removed from her apartment.

58.     What occurred next was captured on video (a copy of which is attached at **EXHIBIT 1**), and incorporated herein by reference.

59.     As depicted in **EXHIBIT 1**, DE LA CRUZ used his duty weapon to shoot and kill TURNER.

60.     Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.      The incident was recorded on DE LA CRUZ'S body camera.

b.      The incident was recorded on a dash camera installed in the police vehicle that DE LA CRUZ used on patrol.

c.      The incident was recorded on a security camera located at The Brixton Apartments.

## I.   The Model X26P TASER Used by DE LA CRUZ

61.     DE LA CRUZ used a model X26P TASER serial number X1200649X.

62.     The model X26P TASER can be used in prong or drive stun mode.

63.     When the model X26P TASER is used in Prong Mode:

a.      The TASER is fired like a handgun.

b.      When it is fired, two darts exit a cartridge on an angle and impact the target.

c.      Due to the angle, the darts spread out over the target intending to impact large muscle groups.

d.      The darts have wires attached to them that remain connected to the TASER.

e.      Electricity flows from the TASER, through the wires, into the darts, and into the large muscles of the target, incapacitating the target.

8

64. When the model X26P TASER is used in Drive Stun Mode:

    a.    The TASER is used like a stun gun.

    b.    The TASER must touch and remain touching the target to be effective.

    c.    Used in this manner, the TASER only causes localized pain.

    d.    The TASER is used in this manner for pain compliance only, not incapacitation.

### J. TURNER Did Not Present as a Credible Threat of Serious Injury or Death

65. Based on TURNER'S position on the ground, the distance created by DE LA CRUZ, and the fact that the cartridge in the TASER had already been fired, at the moment when he used deadly force, DE LA CRUZ knew with certainty that TURNER did not present as a credible threat of causing him to suffer serious bodily injury or death.

66. This is because the model X26P TASER in question is a single shot electronic control weapon; which means that TURNER would have needed to reload the TASER with a new cartridge in order to use the TASER in Prong Mode.

67. This is also because based on TURNER'S body position and the distance between TURNER and DE LA CRUZ, DE LA CRUZ knew that TURNER was not able to use the TASER in Drive Stun Mode against him.

68. Moreover, DE LA CRUZ knew that in Drive Stun Mode, the electronic control weapon is designed to cause localized pain only, not incapacitation.

### K. Prior to the Shooting, Both DE LA CRUZ and CITY Knew TURNER

69. On the night of the homicide, Baytown Police Lieutenant, Steve Dorris, advised a family member that TURNER had been killed.

70.     When asked how he knew that it was TURNER, Dorris stated, "we are familiar with her."

71.     On the same night, Lt. Dorris also stated during a press conference, "one of our patrol officers was patrolling the area of the apartment complex behind us, came across a 45 year old female ***who he knows from prior dealings***, knows that the female had some warrants[.]"

72.     After DE LA CRUZ killed TURNER, a witness reported to a family member that on a date prior to the homicide, DE LA CRUZ had purportedly threatened to shoot TURNER.

73.     A witness also reported that during the three days prior to the shooting, police appeared to be watching TURNER'S apartment.

**L.  Forensically Established that DE LA CRUZ Killed TURNER**

74.     The Harris County Institute of Forensic Sciences (HCIFS) Medical Examiner's Office performed an autopsy on TURNER.

75.     The three bullets fired by DE LA CRUZ into TURNER'S body caused serious and/or lethal injuries:

**Penetrating distant gunshot wound of the left cheek causing non-lethal injury:**

- Entrance wound, distant type (long range) with no gunpowder debris or stippling, left cheek.
- Penetrating injury with fractures, left side, maxilla, cranium.
- Penetrating injury with scrape, left side, inner mandible, cranium.
- Penetrating injury, soft tissues, left neck.
- Penetrating injury, strap muscles, left neck.

**Penetrating distant gunshot wound of the left lateral chest causing lethal injury:**

- Entrance wound, distant type (long range) with no gunpowder debris or stippling, left lateral chest.
- Penetrating injury without rib fractures, sixth intercostal space, left chest.
- Penetrating injury, left lung.
- Penetrating injury, left dome, diaphragm.
- Penetrating injury, liver.
- Penetrating injury, right dome, diaphragm.

- Penetrating injury without rib fractures, ninth intercostal space, right chest.
- Penetrating injury, subcutaneous fat and soft tissue, right lower lateral chest.

**Penetrating distant gunshot wound of the right abdomen causing lethal injury:**

- Entrance wound, distant type (long range) with no gunpowder debris or stippling, right abdomen.
- Penetrating injury, liver.
- Penetrating injury (scrape), tenth thoracic vertebrae.

**M.** **Video of Shooting Surfaces on Social Media and City Intimidates Witnesses**

76. A video of the shooting incident surfaced on social media.

77. In response, the Baytown Police Department advised the media that they wanted the person who recorded the video to come forward and identify themselves.

78. Lt. Dorris issued a statement providing, "It's unfortunate that somebody take [sic] a tragic incident like this and start posting it on social media. That's extremely disrespectful for everybody involved."

79. The media subsequently reported that while the media had identified witnesses who possessed additional video evidence related to the shooting, as a result of the statement release by the police department, the witnesses were afraid to contact the police and/or publish the videos.

**N.** **CITY and CYPRESS POINT Policies, Procedures, and Training Were Moving Force that Caused the Shooting**

80. Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

    a.    CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry for compliance with the Americans with Disabilities Act and/or the Rehabilitation Act, when providing private security,

law enforcement services, and/or housing services, at The Brixton Apartments or similar type housing complexes.

b.      CYPRESS POINT knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry for compliance with the Fair Housing Act, when providing private security, law enforcement services, or housing services, at The Brixton Apartments or similar type housing complexes.

c.      CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding equal protection and non-discrimination in the services that they were providing to the public.

d.      CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding how to interact with mentally ill persons.

e.      CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry for providing private security and/or law enforcement services at The Brixton Apartments or similar type housing units.

f.      CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding how evictions from private housing complexes may lawfully be accomplished.

g.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the proper use of arrest warrants.

h.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the equal treatment of citizens in the service of arrest warrants.

i.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the service of arrest warrants on persons who are known to suffer from mental illness.

j.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the de-escalation of incidents.

k.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the use of deadly force.

l.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding how to respond to a person in possession of a TASER.

m.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding when a TASER in the hands of another constitutes a deadly threat.

n.      CITY knew that their police officers were routinely required to make arrest and/or use of force decisions.

o.      CITY knew that their police officers routinely made incorrect arrest and/or use of force decisions that resulted in violations of citizens' civil rights.

p.      CITY knew that their police officers were routinely required to evaluate facts to determine whether or not deadly force was necessary and lawful.

q.      CITY knew that their police officers routinely incorrectly identified persons as deadly threats, which resulted in violations of citizens' civil rights.

r.      CITY knew that their police officers were routinely requested to assist with evictions from private housing.

s.      CITY knew that their police officers were routinely assisting with evictions from private housing in a manner that resulted in violations of citizens' civil rights.

t.      CITY and/or CYPRESS POINT knew that they failed to adopt and implement specific policies to govern the actions of private security and/or police officers who were providing private security and/or performing the duties of a police officer at The Brixton Apartments or other similar type housing complexes.

u.      Despite it being plainly obvious to CITY and/or CYPRESS POINT, as a result of direct observation, citizen complaints, and/or litigation, that additional or different policies and/or training would protect the rights of citizens, they did not provide the additional or different policies and/or training.

v.      The aforementioned policy and/or training deficiencies were the moving force that caused the injuries and death discussed herein.

81.     The CITY placed DE LA CRUZ on *paid* administrative leave for three days, and then permitted DE LA CRUZ to return to work with administrative duties only while the Texas Rangers completed the homicide investigation.

82.     The Texas Rangers completed the homicide investigation, and then provided their findings to the CITY and the Harris County District Attorney's Office.

83.     Upon receipt of the findings from the Texas Rangers, the CITY did not change DE LA CRUZ'S employment status.

84.     The Civil Rights Division of the Harris County District Attorney's Office, presented the case to a grand jury.

85.     The grand jury returned an indictment against DE LA CRUZ for Aggravated Assault by a Public Servant – a first degree felony.

14

86.     After the grand jury returned the indictment, the CITY changed DE LA CRUZ'S employment status to "non-enforcement" status.

87.     Non-enforcement status means that DE LA CRUZ remains employed as a police officer with his police powers suspended.

## COUNT I

**Plaintiffs v. DE LA CRUZ**
**Fourth Amendment (Excessive Force)**
**Pursuant to 42 U.S.C. § 1983**

88.     Paragraphs 1-87 are incorporated herein by reference.

89.     The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

90.     The right to be free from excessive force during a seizure is clearly established. Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012).

91.     Claims that a police officer used excessive force are analyzed under an "objective reasonableness" standard. See Graham v. Connor, 490 U.S. 386, 388 (1989).

92.     To state a Fourth Amendment claim of excessive force, a Plaintiff must establish that (1) she was seized, (2) she suffered an injury (3) the injury resulted directly from a use of force, and (4) the force used was objectively unreasonable. Flores, 381 F.3d at 396; Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005); Bush v. Strain, 513 F.3d 492, 500-01 (5th Cir. 2008).

93.     In the Fifth Circuit, the excessive force inquiry is limited in scope to whether the officer or other persons were in danger at the moment when they used the force. Harris v. Serpas, 745 F.3d 767, 772 (5th Cir. 2014).

94.     DE LA CRUZ used deadly force against TURNER who did not present as a

credible threat of causing serious injury or death. See e.g., Christopher Cantu v. City of Dothan, Alabama, 974 F.3d 1217 (11th Cir. 2020) ("Woodruff knew the taser was in drive stun mode. Knowing that, a reasonable officer in her position would also have known that if Lawrence had gotten control of the taser and used it against Rhodes it was unlikely to incapacitate him.").

95.     An objectively reasonable police officer, i.e., a police officer acting in accordance with state and federal law, and local and national training standards, would have known that using deadly force against a person who does not present as a credible threat of causing serious injury or death would violate clearly established law.

96.     As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

97.     Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT II

**Plaintiffs v. Defendant CITY and CYPRESS POINT**
**Fourth and Fourteenth Amendments—Municipal Liability**
**Pursuant to 42 U.S.C. § 1983**

98.     Paragraphs 1-87 are incorporated herein by reference.

99.     "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

100.    In addition, a failure to train may give rise to municipal liability if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." <u>Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

101.    CITY and CYPRESS POINT knowingly failed to maintain policies, practices, and training that met the minimum standards in the industry.

102.    As discussed herein, CITY and CYPRESS POINT maintained policies, practices, and customs, which were the moving force that resulted in TURNER'S constitutional rights being violated.

103.    In the alternative, CITY and CYPRESS POINT failed to implement proper policies and training, as discussed herein, which was the moving force that resulted in TURNER'S constitutional rights being violated.

104.    As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

105.    Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

### <u>COUNT III</u>

**Plaintiffs v. Defendant CITY and CYPRESS POINT**
**Violations of Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.,**
**and Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq.**

106.    Paragraphs 1-87 are incorporated herein by reference.

107.    Titles II and III of the Americans with Disabilities Act prohibit discrimination on the basis of disability in all programs, services, and activities of public entities and by private entities that own, operate, or lease places of public accommodation.

108.    The prima facie cases for compensatory claims brought pursuant to § 504 of the RA, and ADA, are identical.

109.    Therefore, in order to state a claim under the ADA and § 504 of the RA, a Plaintiff must sufficiently allege that he (1) is disabled, (2) is otherwise qualified for the service, program, or activity of the public entity, and (3) was discriminated against in that service, program, or activity solely on the basis of his disability.

110.    A disability is defined as (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarded as having such an impairment.

111.    Both the CITY and CYPRESS POINT discriminated against TURNER because of her disability.

112.    As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

113.    Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT IV

**Plaintiffs v. Defendant CYPRESS POINT**
**Violations of The Fair Housing Act of 1968,**
**as amended .S. Code §§ 3601-3619 and 3631**

114.    Paragraphs 1-87 are incorporated herein by reference.

115.    The Fair Housing Act of 1968, as amended 42 U.S. Code §§ 3601-3619 and 3631, specifically prohibits housing discrimination on the following grounds: race, religion, ethnic background or national origin, sex, familial status, or physical or mental disability.

18

116.   CYPRESS POINT discriminated against TURNER because of her disability.

117.   As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

118.   Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT V

**Plaintiffs v. Defendants**
**Survival Claim**
**Pursuant to Texas State Law**

119.   Paragraphs 1-87 are incorporated herein by reference.

120.   TURNER'S claims in life, asserted herein, survive her death.

121.   As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

122.   Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT VI

**Plaintiffs v. Defendants**
**Wrongful Death Claim**
**Pursuant to Texas State Law**

123.   Paragraphs 1-87 are incorporated herein by reference.

124.   Plaintiffs asserts this claim on behalf of TURNER'S survivors.

125.   Plaintiffs seeks all damages available by law for each of the survivors.

126.   As a direct and proximate cause of the Defendants' conduct, TURNER suffered

humiliation, fear, emotional injuries, pain, physical injuries, and death.

127.   Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

**WHEREFORE**, Plaintiffs respectfully requests that judgment be entered in their favor as follows:

A.   **Declaratory Judgment:** Providing that the Defendants' individual and collective conduct violated Plaintiffs' rights;

B.   **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, fear, pain and suffering, physical injury, continuing injury, permanent injury, and loss of life (hedonic damages);

C.   **Punitive damages** as permitted by law;

D.   **Pre and Post Judgment Interest** as permitted by law;

E.   **Equitable Relief:** A written admission of the allegations stated in the Complaint, an in-person oral apology, and a written admission and apology;

F.   **Attorney's Fees and Costs**; and

G.   **Discretionary Damages and Relief:** Such other financial or equitable relief that the Court deems reasonable and just.

## Jury Trial Demand

Plaintiffs respectfully request a trial by jury on all claims/issues in this matter that may be tried to a jury.

Respectfully Submitted,


s/ *Devon M. Jacob*                                        Date: April 8, 2021
**DEVON M. JACOB, ESQUIRE**
PA Bar Number: 89182
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Plaintiffs' Counsel) (Pro Hac Vice to be filed)


s/ *Benjamin L. Crump*                                   Date: April 8, 2021
**BENJAMIN L. CRUMP, ESQUIRE**
FL Bar Number: 72583
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street, Tallahassee, Florida 32301
(850) 224-2023 | court@bencrump.com
(Plaintiffs' Counsel) (Pro Hac Vice to be filed)