**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS (Houston Division)**

| | |
|---|---|
| **CHELSIE CIERRA RUBIN and CAMERON DAISHAUN JANUARY, personally, and as the Personal Representatives of the ESTATE OF PAMELA SHANTAY TURNER,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JUAN PEDRO DE LA CRUZ, CITY OF BAYTOWN, TEXAS, CP 1601 BAYTOWN, LLC, CYPRESS POINT EP I, LLC, CYPRESS POINT MANAGEMENT, LLC, CYPRESS POINT EQUITY PARTNERS, LLC,**<br><br>**Defendants.** | **No. 4:21-cv-1148**<br><br>**District Judge: George C. Hanks, Jr. Magistrate Judge: Andrew M. Edison**<br><br><br>**CIVIL ACTION – LAW JURY TRIAL DEMANDED** |

---

**THIRD AMENDED COMPLAINT**

---

 **AND NOW** come the Plaintiffs, CHELSIE CIERRA RUBIN ("RUBIN") and CAMERON DAISHAUN JANUARY ("JANUARY"), personally, and as the Personal Representatives of the ESTATE OF PAMELA SHANTAY TURNER, by and through their counsel, DEVON M. JACOB, ESQUIRE, of the law firm of JACOB LITIGATION, INC.; and BENJAMIN L. CRUMP, ESQUIRE, of BEN CRUMP LAW, PLLC; to aver the following:

**I. JURISDICTION AND VENUE**

 1. This action is brought pursuant to 42 U.S.C. § 1983; 42 U.S. Code §§ 3601-3619 and 3631; 42 U.S.C. § 12101, *et seq.*, and 29 U.S.C. § 701, *et seq.*

 2. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

1

3.      Venue is proper in this Court, as the cause of action arose in the Southern District of Texas (Houston Division).

## II.  IDENTIFICATION OF PARTIES, DECEDENT, AND SURVIVORS

4.      Decedent, PAMELA SHANTAY TURNER ("TURNER"), was an adult female, who on the date of her death, resided in Baytown, Harris County, Texas. TURNER was born on April 8, 1975. On May 13, 2019, DE LA CRUZ unlawfully killed TURNER.

5.      Plaintiff, CHELSIE CIERRA RUBIN ("RUBIN"), is an adult female who lives in Houston, Harris County, Texas. RUBIN is TURNER'S biological daughter.

6.      Plaintiff, CAMERON DAISHAUN JANUARY ("JANUARY"), is an adult male who lives in Houston, Harris County, Texas. JANUARY is TURNER'S biological son.

7.      Defendant, JUAN PEDRO DE LA CRUZ ("DE LA CRUZ"), is an adult male who during all relevant times, was employed by the City of Baytown, Texas, as a police officer. All of Defendant DE LA CRUZ'S actions or inactions were taken under color of state law. He is sued in his individual capacity.

8.      Defendant, CITY OF BAYTOWN, TEXAS ("CITY"), owns and operates the Baytown Police Department. City Hall is located at 2401 Market Street, Baytown, Texas, 77522. The Baytown Police Department is located at 3200 N. Main Street, Baytown, Texas, 77521.

9.      Defendant, CP 1601 BAYTOWN, LLC, during all relevant times, owned and managed an apartment complex under the assumed name, THE BRIXTON APARTMENTS. The Brixton Apartments is located at 1601 Garth Road, Baytown, Harris County, Texas, 77520. CP 1601 BAYTOWN, LLC has a registered principal place of business of 2000 Bering Drive, Suite 455, Houston, TX 77057. CP 1601 BAYTOWN, LLC'S member, director, and registered agent –

Terry A. Turner, and managers – CYPRESS POINT EP I, LLC and Terry A. Turner, were also located at 2000 Bering Drive, Suite 455, Houston, TX 77057.[1]

10.     Defendant, CYPRESS POINT EP I, LLC,[2] during all relevant times, owned and/or managed CP 1601 BAYTOWN, LLC, along with Terry A. Turner. CYPRESS POINT EP I, LLC has a registered address of 2000 Bering Drive, Suite 455, Houston, TX 77057. CYPRESS POINT EP I, LLC'S member, director, and registered agent is Terry A. Turner, with an address of 2000 Bering Drive, Suite 455, Houston, TX 77057. CYPRESS POINT EP I, LLC, is managed by CYPRESS POINT EQUITY PARTNERS, LLC, located at 2000 Bering Drive, Suite 455, Houston, TX 77057.

11.     Defendant, CYPRESS POINT EQUITY PARTNERS, LLC, during all relevant times, owned and managed The Brixton Apartments ("Brixton Apartments"), 1601 Garth Road, Baytown, Harris County, Texas, 77520. CYPRESS POINT EQUITY PARTNERS, LLC has a registered principal place of business of 2000 Bering Drive, Suite 455, Houston, TX 77057. CYPRESS POINT EQUITY PARTNERS, LLC'S registered agent is Terry Turner, 4212 Gibson Street, Houston, TX 77007.

12.     Defendant, CYPRESS POINT MANAGEMENT, LLC, during all relevant times, managed The Brixton Apartments. During all relevant times, CYPRESS POINT MANAGEMENT, LLC had a principal office and a principal place of business located at 2000 Bering Drive, Suite 455, Houston, TX 77057. During all relevant times, Terry A. Turner was the sole member, president, and registered agent of CYPRESS POINT MANAGEMENT, LLC.

---

[1] On July 1, 2020, the registered agent of CP 1601 BAYTOWN, LLC, was changed from Terry A. Turner to Two Half-Hitches Oil & Gas, LLC, with a registered office of 55 Waugh Drive, Suite 600, Houston, TX 77007.

[2] Not to be confused with CYPRESS POINT EP II, LLC; CYPRESS POINT EP III, LLC; or CYPRESS POINT EP IV, LLC, additional entities believed to be owned and/or managed, in whole or in part, by Terry A. Turner.

III. <u>MATERIAL FACTS</u>

    A.  <u>Terry A. Turner, his CYPRESS POINT entities; and out of date and/or conflicting information published and recorded.</u>

        13.    CYPRESS POINT EQUITY PARTNERS, LLC, has a registered principal place of business of 2000 Bering Drive, Suite 455, Houston, TX 77057.

        14.    CYPRESS POINT EQUITY PARTNERS, LLC'S registered agent is Terry Turner, 4212 Gibson Street, Houston, TX 77007.

        15.    The website for CYPRESS POINT EQUITY PARTNERS, LLC, provides that in 2017, CYPRESS POINT EQUITY PARTNERS, LLC, acquired The Brixton Apartments, and as of the date of the filing of the original Complaint, and this Amended Complaint, lists The Brixton Apartments as part of its portfolio.[3]

        16.    The website for CYPRESS POINT EQUITY PARTNERS, LLC, identifies Terry A. Turner as CYPRESS POINT EQUITY PARTNERS, LLC'S founder and chief executive officer, and contains the following statements:

> Cypress Point Equity Partners is a privately owned, fully integrated real estate investment firm based in Houston, Texas that focuses on the acquisition and management of value-add multifamily properties.

> Cypress Point's objective is to maximize investor returns by enhancing the value of its investments through extensive interior and exterior renovations and unparalleled property management services, while improving quality of life for our residents.

> Cypress Point has a fully owned and operated property management company which allows for full control and monitoring of on-site activities to ensure successful business plan execution.

> By hiring and retaining quality individuals who are ultimately the "face of the property," we are able to differentiate ourselves from competitors and achieve superior performance.

---

[3] See http://www.cypresspointequity.com/portfolio/

17.     As a result of and in reliance on the information published by Terry A. Turner and CYPRESS POINT EQUITY PARTNERS, LLC, Plaintiffs timely named CYPRESS POINT EQUITY PARTNERS, LLC, as a Defendant in the original Complaint (Doc. 1).

18.     Plaintiffs then attempted service on Terry A. Turner, CYPRESS POINT EQUITY PARTNERS, LLC'S registered agent.

19.     CYPRESS POINT EQUITY PARTNERS, LLC, however, failed to provide the State of Texas with current information for its registered agent.

20.     As a result, Plaintiffs' service attempts at the registered address were not successful.

21.     Plaintiffs conducted further investigation and located an address associated with Terry Turner's name.

22.     While multiple service attempts at address number two similarly failed, contact was made with a female at the address who is believed to be Terry Turner's mother, which prompted a call from a lawyer who identified himself as the lawyer for CYPRESS POINT EQUITY PARTNERS, LLC.

23.     The lawyer advised that he was in contact with Terry Turner and that Terry Turner insisted on being personally served with process.

24.     The lawyer provided a third address where Terry Turner claimed he could be served.

25.     Multiple service attempts at the third address similarly failed.

26.     The lawyer then provided a fourth address where Terry Turner claimed he could be served.

27.     Terry Turner was personally served with process at the fourth address.

28.     The lawyer advised Plaintiffs that during the relevant period of time, CYPRESS POINT EQUITY PARTNERS, LLC, neither owned nor management The Brixton Apartments.

29.     The lawyer provided Plaintiffs with additional information, which through additional investigation, revealed the following facts that are presented in the alternative:

30.     In May of 2019, CP 1601 BAYTOWN, LLC, owned and managed an apartment complex under the assumed name, The Brixton Apartments.

31.     The Brixton Apartments is located at 1601 Garth Road, Baytown, Harris County, Texas, 77520.

32.     The Brixton Apartments has significantly more than five apartments available for rent and the owner of the complex does not live at the complex.

33.     CP 1601 BAYTOWN, LLC had a registered principal place of business of 2000 Bering Drive, Suite 455, Houston, TX 77057.

34.     CP 1601 BAYTOWN, LLC'S member, director, and registered agent – Terry A. Turner, and managers – CYPRESS POINT EP I, LLC and Terry A. Turner, were also located at 2000 Bering Drive, Suite 455, Houston, TX 77057.

35.     In May of 2019, CYPRESS POINT EP I, LLC, owned and/or managed CP 1601 BAYTOWN, LLC, along with Terry A. Turner.

36.     CYPRESS POINT EP I, LLC has a registered address of 2000 Bering Drive, Suite 455, Houston, TX 77057.

37.     CYPRESS POINT EP I, LLC'S member, director, and registered agent is Terry A. Turner, with an address of 2000 Bering Drive, Suite 455, Houston, TX 77057.

38.     CYPRESS POINT EP I, LLC, is managed by CYPRESS POINT EQUITY PARTNERS, LLC, located at 2000 Bering Drive, Suite 455, Houston, TX 77057.

39.     In May of 2019, CYPRESS POINT MANAGEMENT, LLC, managed The Brixton Apartments.

40.     CYPRESS POINT MANAGEMENT, LLC had a principal office and a principal place of business located at 2000 Bering Drive, Suite 455, Houston, TX 77057.

41.     Terry A. Turner was the sole member, president, and registered agent of CYPRESS POINT MANAGEMENT, LLC.

42.     Within the period provided by the Court for serving the summons and Original Complaint, CYPRESS POINT EQUITY PARTNERS, LLC; CP 1601 BAYTOWN, LLC; CYPRESS POINT EP I, LLC; and CYPRESS POINT MANAGEMENT, LLC; all received notice of the pending litigation through Terry A. Turner, such that they will not be prejudiced in defending on the merits.

43.     CYPRESS POINT EQUITY PARTNERS, LLC; CP 1601 BAYTOWN, LLC; CYPRESS POINT EP I, LLC; and CYPRESS POINT MANAGEMENT, LLC; knew or should have known that the action would have been brought against them, but for an apparent mistake concerning the proper party's identity.

44.     CYPRESS POINT EQUITY PARTNERS, LLC; CP 1601 BAYTOWN, LLC; CYPRESS POINT EP I, LLC; and CYPRESS POINT MANAGEMENT, LLC (hereinafter, collectively "CYPRESS POINT") are all named as Defendants because despite Plaintiffs' request that the lawyer confirm the relationship between all of the entities, Terry Turner, and The Brixton Apartments, he has failed to do so.

45.     In addition, despite the lawyer advising that he does not represent Terry Turner personally, he has refused to produce contact information for Terry Turner.

**B. DE LA CRUZ employed by CITY OF BAYTOWN, TEXAS, and CYPRESS POINT.**

46.     CITY OF BAYTOWN, TEXAS, owns and operates the Baytown Police Department.

47.     During all events discussed herein, CITY OF BAYTOWN, TEXAS ("CITY"), acted by and through its policymakers.[4]

48.     In May of 2019, JUAN PEDRO DE LA CRUZ ("DE LA CRUZ") was a police officer employed by CITY.

49.     During the same period of time, DE LA CRUZ was also a private security guard employed by CYPRESS POINT; the owner and/or management company for The Brixton Apartments.

50.     CYPRESS POINT acted through its agents and employees.

51.     CYPRESS POINT hired DE LA CRUZ specifically because he had police powers and the ability to act under color of state law.

52.     The expectation was that DE LA CRUZ would use his authority as a police officer to further CYPRESS POINT'S security interests.

**C. TURNER harassed by CYPRESS POINT because of her disability.**

53.     PAMELA SHANTAY TURNER ("TURNER") was born on April 8, 1975, and in May of 2019, was 44 years old.

54.     TURNER has two biological children – a son, CAMERON DAISHAUN JANUARY ("JANUARY"), and a daughter, CHELSIE CIERRA RUBIN ("RUBIN").

---

[4] The Administrative Bureau consists of the Chief of Police, his Administrative Assistant, the Legal Advisor and the Internal Affairs Division. Collectively, with the Bureau Commanders, it makes and administers policy for the Department. Bureau Commanders head the individual bureaus within the Department and answer to the Chief of Police. *See https://baytown.org/529/Administration*

55.     In 2018, TURNER moved to The Brixton Apartments to be closer to her family and to be reunited with her dog.

56.     It was known to DE LA CRUZ, CITY, and CYPRESS POINT, that TURNER suffered from a mental illness – paranoid schizophrenia – that rendered her disabled.

57.     DE LA CRUZ, CITY, and CYPRESS POINT, engaged in disparate treatment – intentional discrimination – against TURNER, solely because of her mental disability.

58.     DE LA CRUZ, CITY, and CYPRESS POINT, harassed TURNER and treated her differently than other residents because of her mental disability that they found to be annoying.

59.     CYPRESS POINT made fun of how TURNER spoke.

60.     TURNER liked to go to The Brixton Apartments' office to partake in the coffee that was available to residents.

61.     CYPRESS POINT denied TURNER access to the office because of her disability.

62.     CYPRESS POINT told TURNER that her rent had not been received (after her rent had been paid).

63.     CYPRESS POINT required TURNER to provide proof of rent payment despite knowing it had been paid.

64.     CYPRESS POINT sent DE LA CRUZ to TURNER'S apartment to intimidate her to try to get her to move out.

65.     CYPRESS POINT threatened to evict TURNER from the property because of her disability.

66.     CYPRESS POINT evicted TURNER from the property because of her disability.

67.     CYPRESS POINT and DE LA CRUZ agreed that DE LA CRUZ would serve low-level warrants on TURNER on the same date that an eviction notice was served, so that the eviction could be accomplished.

68.     This way, TURNER would be placed in jail instead of being forced into homelessness.

69.     While service of a valid arrest warrant is generally a lawful activity, selective enforcement of the law for the sole purpose of discriminating against a mentally ill person because of their disability, is not.

70.     CITY and CYPRESS POINT denied TURNER continued access to the parking lot, hallway, and her rental unit, because of her disability.

71.     Other residents of THE BRIXTON APARTMENTS who did not suffer from mental disabilities were not treated in the same manner.

**D.  CITY on notice regarding TURNER'S disability.**

72.     On several occasions, TURNER complained to family about being harassed by police officers who she believed were employed by the Baytown Police Department.

73.     TURNER advised family that on or about December 4, 2018, police officers arrested her and transported her from Baytown, Texas, to a location in Houston, Texas.

74.     TURNER reported that the police officers dropped her off at a location in Houston, Texas, for the purpose of obtaining mental health treatment.

75.     The officers did not notify TURNER'S family about her arrest.

76.     TURNER reported that the facility where she was brought did not accept her for treatment and that the police officers did not provide her with a ride home.

77.     TURNER further reported that as a result, she had to hitchhike home.

78.     On December 5, 2018, a member of TURNER'S family called the Baytown Police Department and inquired about the department's policy for handling mental health incidents.

79.     The family member asked why TURNER had been left with the impression that officers were harassing her, why officers had not contacted TURNER'S family, why officers had placed TURNER in a situation where she needed to hitchhike home, and warned the call-taker that in those types of situations, if anything happened to TURNER, the police officers would be held accountable.

**E.  TURNER meets DE LA CRUZ.**

80.     TURNER reported to her family that she believed that the security guard in the building was also a police officer who lived in the building.

81.     TURNER referred to the officer as "robocop," and said that the police officer harassed her on behalf of the apartment manager.

82.     TURNER was terrified of the officer.

83.     On one particular occasion, the officer came to her apartment and left her with the impression that he wanted to kill her.

84.     TURNER described the police officer as a Hispanic male, wearing a grey shirt, khaki cargo pants, and a gun.

85.     The man identified himself as a police officer and had his hand on his gun during the conversation.

86.     TURNER reported that she told the officer that she was in her home, minding her own business, and asked him why he was bugging her.

11

87.     TURNER said that the security guard who identified himself as a police officer told her that he was investigating a noise complaint, and that if he had to return to her apartment, the apartment complex was going to have to "put her out."

88.     The problem with the police officer's assertion is that TURNER was not causing any disturbance.

89.     Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.      DE LA CRUZ was a resident of The Brixton Apartments.

b.      DE LA CRUZ was the security guard police officer – "robocop" – who came to TURNER'S apartment.

c.      CYPRESS POINT and DE LA CRUZ agreed that DE LA CRUZ would use his police powers to harass TURNER because of her disability (as evidenced by the conduct discussed above).

d.      CYPRESS POINT and DE LA CRUZ agreed that because TURNER'S disability had become an annoyance to the building manager, DE LA CRUZ would use his authority as a police officer in conjunction with physical intimidation to pressure TURNER to voluntarily move out.

e.      Stated another way, CYPRESS POINT and DE LA CRUZ agreed that DE LA CRUZ would unlawfully engage in official oppression to violate the Americans with Disabilities Act, Rehabilitation Act, and the Fair Housing Act.

12

F. **Manager provokes confrontation that results in TURNER'S arrest.**

90.     During one of the incidents involving the manager of the apartment complex harassing TURNER, TURNER allegedly broke the manager's glasses leaving a scratch.

91.     As a result, TURNER was charged with misdemeanor criminal mischief and assault.

92.     When TURNER failed to appear in court, two arrest warrants were issued for the low-level offenses.

G. **RUBIN speaks with DE LA CRUZ.**

93.     RUBIN received a telephone call from a male who requested a return call.

94.     When she returned the call, a male answered the telephone and identified himself as a police officer who was employed by the Baytown Police Department.

95.     The police officer was rude.

96.     The police officer complained that he was on his days off and wanted to be spending time visiting with his family, not speaking with RUBIN.

97.     The police officer stated that he wanted to have TURNER involuntarily committed for a mental health evaluation, and that he needed a family member to speak with medical personnel.

98.     Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.     DE LA CRUZ was the police officer who spoke with RUBIN.

**H. CYPRESS POINT employees threaten to put TURNER on the street.**

99.    In May of 2019, the manager of The Brixton Apartments notified TURNER'S family that they intended to put TURNER on the street.

100.    The family advised the manager not to do so.

101.    The family further advised the manager that arrangements would be made to move TURNER out of her apartment within the week.

**I. DE LA CRUZ attempts to evict TURNER by taking TURNER to jail but instead shoots and kills TURNER.**

102.    On May 9, 2019, a Writ of Possession was issued authorizing TURNER to be evicted from her apartment.

103.    The Writ of Possession indicated that at any specified date/time at least 24 hours after proper posting of a warning on the outside of her apartment door, TURNER could be evicted.

104.    A document indicates that on May 13, 2019, at 12:50 PM, TURNER was served with an Eviction Notice.

105.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.    CYPRESS POINT and DE LA CRUZ agreed that DE LA CRUZ would serve the low-level warrants on TURNER on the same date that the eviction notice was served, so that the eviction could be accomplished.

b.    This way, TURNER would be placed in jail instead of being forced into homelessness.

c.      While service of a valid arrest warrant is generally a lawful activity, selective enforcement of the law for the sole purpose of discriminating against a mentally ill person because of their disability, is not.

106.    On the night of May 13, 2019, while on patrol with the CITY, DE LA CRUZ went looking for TURNER and kept watch on The Brixton Apartments, near TURNER'S apartment building.

107.    At around 10:40 PM, DE LA CRUZ was present when TURNER arrived home.

108.    DE LA CRUZ announced over the police radio that he was out with TURNER.

109.    DE LA CRUZ intended to place TURNER under arrest pursuant to the arrest warrants and transport her to jail.

110.    When DE LA CRUZ made contact with TURNER, he was not responding to a disorder, was not responding to an emergency, and had not been dispatched to an incident.

111.    DE LA CRUZ had time to plan and prepare before interacting with TURNER.

112.    What occurred next was captured on video (a copy of which is attached at **EXHIBIT 1**) and is incorporated herein by reference.

113.    As depicted in **EXHIBIT 1**, DE LA CRUZ used his duty weapon to shoot and kill TURNER.

114.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.      The incident was recorded on DE LA CRUZ'S body camera.

b.      The incident was recorded on a dash camera installed in the police vehicle that DE LA CRUZ used on patrol.

c.     The incident was recorded on a security camera located at The Brixton Apartments.

115.    DE LA CRUZ knew from previous encounters with TURNER that as a result of her mental illness, she had the potential to get upset and scared easily.

116.    Despite the fact that TURNER was not engaged in criminal activity at the time, and the fact that even if valid, the warrants in question were for minor offenses the underlying facts of which he was aware, DE LA CRUZ still decided to confront TURNER alone – without a backup officer or mental health worker to assist.

117.    Once TURNER became upset (as expected), despite knowing that she was not a threat to anyone, and despite knowing where she lived, DE LA CRUZ decided that an immediate arrest was necessary, even if it meant using deadly force.

118.    Despite the fact that there was no danger to the public, TURNER, or himself, DE LA CRUZ immediately resorted to an elevated use of force – the TASER – instead of attempting to de-escalate the situation through negotiation, clear orders, or restraint techniques.

119.    Prior to his encounter with TURNER, DE LA CRUZ had fair warning that his quick resort to force under these circumstances violated clearly established law. See e.g., Trammell v. Fruge, 868 F.3d 332 (5th Cir. 2017); Newman v. Guedry, 703 F.3d 757 (5th Cir. 2012); Deville v. Marcantel, 567 F.3d 156 (5th Cir. 2009).

**J.   The Model X26P TASER Used by DE LA CRUZ**

120.    DE LA CRUZ used a model X26P TASER serial number X1200649X.

121.    DE LA CRUZ had been training regarding how the TASER operates.

122.    The model X26P TASER can be used in prong or drive stun mode.

123.    When the model X26P TASER is used in Prong Mode:

a.     The TASER is fired like a handgun.

b.      When it is fired, two darts exit a cartridge on an angle and impact the target.

c.      Due to the angle, the darts spread out over the target intending to impact large muscle groups.

d.      The darts have wires attached to them that remain connected to the TASER.

e.      Electricity flows from the TASER, through the wires, into the darts, and into the large muscles of the target, incapacitating the target.

124.    When the model X26P TASER is used in Drive Stun Mode:

a.      The TASER is used like a stun gun.

b.      The TASER must touch and remain touching the target to be effective.

c.      Used in this manner, the TASER only causes localized pain.

d.      The TASER is used in this manner for pain compliance only, not incapacitation.

**K.   TURNER did not present as a credible threat of serious injury or death.**

125.    Based on TURNER'S position on the ground, the distance created by DE LA CRUZ, and the fact that the cartridge in the TASER had already been fired, at the moment when he used deadly force, DE LA CRUZ knew with certainty that TURNER did not present as a credible threat of causing him to suffer serious bodily injury or death.

126.    This is because the model X26P TASER in question is a single shot electronic control weapon; which means that TURNER would have needed to reload the TASER with a new cartridge in order to use the TASER in Prong Mode.

127.    This is also because based on TURNER'S body position and the distance between TURNER and DE LA CRUZ, DE LA CRUZ knew that TURNER was not able to use the TASER in Drive Stun Mode against him.

128.     Moreover, DE LA CRUZ knew that in Drive Stun Mode, the electronic control weapon is designed to cause localized pain only, not incapacitation.

**L.  Prior to the shooting, both DE LA CRUZ and CITY knew TURNER**

129.     On the night of the homicide, Baytown Police Lieutenant, Steve Dorris, advised a family member that TURNER had been killed.

130.     When asked how he knew that it was TURNER, Dorris stated, "we are familiar with her."

131.     On the same night, Lt. Dorris also stated during a press conference, "one of our patrol officers was patrolling the area of the apartment complex behind us, came across a 45 year old female ***who he knows from prior dealings***, knows that the female had some warrants[.]"

132.     After DE LA CRUZ killed TURNER, a witness reported to a family member that on a date prior to the homicide, DE LA CRUZ had purportedly threatened to shoot TURNER.

133.     A witness also reported that during the three days prior to the shooting, police appeared to be watching TURNER'S apartment.

**M.  Baytown Police Department manipulating public opinion.**

134.     At the scene of the incident, before TURNER'S body had even been removed from the crime scene, Lt. Dorris conducted a press conference.

135.     At the time, no investigation had been completed.

136.     Regardless, Lt. Dorris claimed that the officer had been "injured" despite the fact that he was not "injured" (in the common use of the word).

137.     Lt. Dorris also stated, "If you've ever been struck with a Taser, it's a very painful experience, so there was I'm sure a great deal of pain there when he was struck with it."

138.     DE LA CRUZ would later adopt this story as part of his criminal defense.

18

**N. Forensically established that DE LA CRUZ killed TURNER.**

139.     The Harris County Institute of Forensic Sciences (HCIFS) Medical Examiner's Office performed an autopsy on TURNER.

140.     The three bullets fired by DE LA CRUZ into TURNER'S body caused serious and/or lethal injuries:

**Penetrating distant gunshot wound of the left cheek causing non-lethal injury:**

- Entrance wound, distant type (long range) with no gunpowder debris or stippling, left cheek.
- Penetrating injury with fractures, left side, maxilla, cranium.
- Penetrating injury with scrape, left side, inner mandible, cranium.
- Penetrating injury, soft tissues, left neck.
- Penetrating injury, strap muscles, left neck.

**Penetrating distant gunshot wound of the left lateral chest causing lethal injury:**

- Entrance wound, distant type (long range) with no gunpowder debris or stippling, left lateral chest.
- Penetrating injury without rib fractures, sixth intercostal space, left chest.
- Penetrating injury, left lung.
- Penetrating injury, left dome, diaphragm.
- Penetrating injury, liver.
- Penetrating injury, right dome, diaphragm.
- Penetrating injury without rib fractures, ninth intercostal space, right chest.
- Penetrating injury, subcutaneous fat and soft tissue, right lower lateral chest.

**Penetrating distant gunshot wound of the right abdomen causing lethal injury:**

- Entrance wound, distant type (long range) with no gunpowder debris or stippling, right abdomen.
- Penetrating injury, liver.
- Penetrating injury (scrape), tenth thoracic vertebrae.

**O. Video of shooting surfaces on social media and CITY intimidates witnesses.**

141.     A video of the shooting incident surfaced on social media.

142.     In response, the Baytown Police Department advised the media that they wanted the person who recorded the video to come forward and identify themselves.

143.    Lt. Dorris issued a statement providing, "It's unfortunate that somebody take [sic] a tragic incident like this and start posting it on social media. That's extremely disrespectful for everybody involved."

144.    The media subsequently reported that while the media had identified witnesses who possessed additional video evidence related to the shooting, as a result of the statement release by the police department, the witnesses were afraid to contact the police and/or publish the videos.

**P.  <u>CITY and CYPRESS POINT policies, procedures, and training were the moving force that caused the constitutional injury.</u>**

145.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.    CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry for compliance with the Americans with Disabilities Act and/or the Rehabilitation Act, when providing private security, law enforcement services, and/or housing services, at The Brixton Apartments or similar type housing complexes.

b.    CYPRESS POINT knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry for compliance with the Fair Housing Act, when providing private security, law enforcement services, or housing services, at The Brixton Apartments or similar type housing complexes.

c.    CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding equal protection and non-discrimination in the services that they were providing to the public.

d.      CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding how to interact with mentally ill persons.

e.      CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry for providing private security and/or law enforcement services at The Brixton Apartments or similar type housing units.

f.      CITY and CYPRESS POINT knew that they failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding how evictions from private housing complexes may lawfully be accomplished.

g.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the proper use of arrest warrants.

h.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the equal treatment of citizens in the service of arrest warrants.

i.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the service of arrest warrants on persons who are known to suffer from mental illness.

j.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the de-escalation of incidents.

k.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding the use of deadly force.

l.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding how to respond to a person in possession of a TASER.

m.      CITY knew that it failed to adopt, implement, and/or maintain, policies and/or training that met the standard in the industry regarding when a TASER in the hands of another constitutes a deadly threat.

n.      CITY knew that their police officers were routinely required to make arrest and/or use of force decisions.

o.      CITY knew that their police officers routinely made incorrect arrest and/or use of force decisions that resulted in violations of citizens' civil rights.

p.      CITY knew that their police officers were routinely required to evaluate facts to determine whether or not deadly force was necessary and lawful.

q.      CITY knew that their police officers routinely incorrectly identified persons as deadly threats, which resulted in violations of citizens' civil rights.

r.      CITY knew that their police officers were routinely requested to assist with evictions from private housing.

s.      CITY knew that their police officers were routinely assisting with evictions from private housing in a manner that resulted in violations of citizens' civil rights.

t.      CITY and/or CYPRESS POINT knew that they failed to adopt and implement specific policies to govern the actions of private security and/or police officers who were providing private security and/or performing the duties of a police officer at The Brixton Apartments or other similar type housing complexes.

u.      Despite it being plainly obvious to CITY and/or CYPRESS POINT, as a result of direct observation, citizen complaints, and/or litigation, that additional or different policies and/or training would protect the rights of citizens, they did not provide the additional or different policies and/or training.

v.      The aforementioned policy and/or training deficiencies were the moving force that caused the injuries and death discussed herein.

146.    The CITY placed DE LA CRUZ on *paid* administrative leave for three days, and then permitted DE LA CRUZ to return to work with administrative duties only while the Texas Rangers completed the homicide investigation.

147.    The Texas Rangers completed the homicide investigation, and then provided their findings to the CITY and the Harris County District Attorney's Office.

148.    Upon receipt of the findings from the Texas Rangers, the CITY did not change DE LA CRUZ'S employment status.

149.    The Civil Rights Division of the Harris County District Attorney's Office, presented the case to a grand jury.

150.    The grand jury returned an indictment against DE LA CRUZ for Aggravated Assault by a Public Servant – a first degree felony.

151.    After the grand jury returned the indictment, the CITY changed DE LA CRUZ'S employment status to "non-enforcement" status.

152.    Non-enforcement status means that DE LA CRUZ remains employed as a police officer with his police powers suspended.

**Q.** **CITY had notice of pattern and practice of excessive force and used misleading public statements to protect officers and avoid oversight.**

153.   Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.   In 2010, following a pursuit of a motorcycle that crashed, a Baytown police officer was observed punching the driver, who was pinned under the vehicle, in the head and slamming his head on the ground.

b.   In 2012, CITY received notice that Baytown officers engaged in a vehicle pursuit of a retail theft suspects.

c.   Officers deployed a spike strip in a busy intersection, which resulted in the pursued vehicle slamming into a vehicle with two minor occupants.

d.   The accident caused a fire that killed one of the minors and seriously injured the second minor.

e.   Baytown Police Department's statement failed to mention use of a spike strip.

f.   In May of 2014, CITY received notice that Baytown officers used excessive force when they TASERED, pepper sprayed, and unlawfully arrested Maria Zepeda, while investigating a noise complaint.

g.   In August of 2014, CITY received notice that Baytown officers committed an unlawful traffic stop to harass a woman who had previously asked to speak with a police supervisor.

h.   In February of 2016, CITY received notice that Baytown Officers used excessive force when they TASERED and unlawfully arrested Alfred Thomas and his son Jamarcus Thomas while investigating a noise complaint.

24

i.      In October of 2018, CITY received notice that Baytown officers used excessive force against Ashley Serbe and John Reyes during a minor incident involving a dispute over a cell phone.

j.      At least six Baytown officers were present and either participated in the excessive use of force, or despite an appreciable opportunity to intervene to prevent the unlawful conduct, failed to do so.

k.      At least one supervisor participated in the use of unlawful force.

l.      Once the decision was made to effect an arrest, in both incidents, officers immediately resorted to excessive force instead of attempting to de-escalate the situation through negotiation, clear orders, or restraint techniques.

m.      The CITY released an official statement that did not accurately describe the conduct captured on video and downplayed and excused the officers' unlawful conduct.

n.      CITY did not discipline or retrain any of the six involved officers.

o.      In October of 2018, CITY received notice that Baytown officer, Christopher Felds, used excessive force against Jefte Sprecher when the officer pulled him from a vehicle, punched him repeatedly, choked him, and caused his unlawful arrest during a personal dispute.

p.      Felds immediately resorted to excessive force instead of attempting to de-escalate the situation through negotiation, clear orders, or restraint techniques.

q.      In November of 2018, CITY received notice that Baytown officers used excessive force against Jorge Soto, when the held him down on the ground and punched him in the face.

r.      In January of 2019, CITY received notice that Baytown officers used or permitted excessive force to be used against Raphael White when they permitted a K-9 to repeatedly bite him after he became compliant and submitted himself for arrest.

25

s.      Several Baytown officers were present and either participated in the excessive use of force, or despite an appreciable opportunity to intervene to prevent the unlawful conduct, failed to do so.

t.      Only after a community activist and White conducted a press conference to complain about the unlawful use of force and intimidation when citizens attempt to file a complaint against officers in person at the police department did the CITY review the incident.

u.      The CITY found no abuse, released video of the incident, and had Detective Lance Watkins provide an interview during which time the detective misrepresented and excused Brown's conduct, and referred to Brown as "doing his job," being engaged in "proactive" policing, and "being good at it."

v.      CITY did not discipline or retrain any of the involved officers.

w.      On May 27, 2019, CITY received notice that Baytown officers used excessive force against Lorraine Solis when they threw her on the ground while unlawfully arresting her.

x.      CITY received notice that Baytown officers used excessive force against James LaBeardo when he punched him repeatedly and let a K-9 bite him in retaliation for coffee being thrown at him.

y.      Once the decision was made to effect an arrest, the officer immediately resorted to excessive force instead of attempting to de-escalate the situation through negotiation, clear orders, or restraint techniques.

z.      The CITY released an official statement that did not accurately describe the conduct captured on video and downplayed and excused the officers' unlawful conduct.

aa.      CITY did not discipline or retrain the involved officer.

bb.      In July of 2019, CITY received notice that Baytown officers Teddy Sims and Samuel Serrett used excessive force against Kedrick Crawford, when they TASERED and beat him while placing him under arrest.

cc.      The incident occurred during the search of Crawford's vehicle.

dd.      An officer told Crawford that he was free to leave.

ee.      Only seconds later, however, officers slammed Crawford on the hood of a car and then hit and TASERED him.

ff.      Once the decision was made to effect an arrest, the officers immediately resorted to excessive force instead of attempting to de-escalate the situation through negotiation, clear orders, or restraint techniques.

gg.      The CITY released an official statement that did not accurately describe the conduct captured on video and downplayed and excused the officers' unlawful conduct.

hh.      CITY received notice many of the aforementioned incidents involved multiple officer who witnessed the unlawful conduct but despite an appreciable opportunity to do so, failed to intervene to stop the conduct.

ii.      Regardless, CITY did not discipline and/or retrain these backup officers; reinforcing the CITY policy and practice of permitting the use of excessive force.

jj.      While Sims and Serrett have since been indicted for assault, the officers remain employed by CITY.

kk.      In June of 2020, former Baytown police officer, Nathaniel Brown, approached Skylar Gilmore who was recording an arrest from a distance, attempted to confiscate his cellphone, and immediately resorted to a use of force in an attempt to make an unlawful arrest.

ll.     Despite witnessing and having an appreciable opportunity to intervene to stop Brown's unlawful conduct, the supervisor failed to do so.

mm.     Instead, the supervisor also resorted to an immediate use of force against Isaiah Phillips, who complained about Brown's unlawful conduct, and tried to deescalate the situation; only to be shoved by Brown into the supervisor.

nn.     The supervisor's statement of law on scene reflected a clear lack of understanding of the state's crimes code and civil rights.

oo.     Brown threw Gilmore to the ground, kneed him in the face, unlawfully arrested him, and then roughly grabbed and pulled on him.

pp.     Brown and the supervisor then used immediate and excessive force to slam Phillips down on the hood of a car and arrest him.

qq.     CITY referred the matter to internal affairs only after a video of the unlawful conduct went viral.

rr.     Unlike DE LA CRUZ, CITY terminated Brown's employment about one month after the incident; evidencing a partial change in policy after the TURNER incident.

ss.     CITY did not discipline or retrain supervisor and permitted supervisor to remain a supervisor.

**R.  Internal affairs complaint process discourages complaints from being filed.**

154.     A citizen must make a complaint before a use of force incident is subject to review by internal affairs.

155.     During the relevant period of time, unlike the Baytown Crime Stoppers program, the procedure for filing a complaint against a police office did not permit anonymous complaints,

did not offer monetary rewards, and the link was not displayed prominently on the department's website.

156.   Rather, the link to file a complaint against a police officer could only be found under a submenu under "Make a Police Report."

157.   Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.   Citizens have reported being harassed and discouraged from filing complaints against officers.

b.   Even when well supported complaints are filed, they rarely result in discipline and/or retraining.

### S.   CITY'S false and/or misleading public statements that contain boilerplate promises of integrity and accountability.

158.   CITY permits excessive force because it knows there is no consequence to the CITY.

159.   The stated policy/practice of CITY is to defend but not indemnify its officer in civil rights matters.

160.   The avoidance of liability starts immediately, with the release of public statements that deviate from the known truth.

161.   The false statements often contain boilerplate language promising integrity, complete investigations, and accountability to high standards of professionalism.

162.   The boilerplate promises embedded in these public statements have been used for at least seven years:

The Baytown Police Department takes allegations of wrongdoing or misconduct by our officers very seriously. The trust and confidence of our community is paramount and as such we hold our officers to the highest levels of integrity as well as moral, ethical and professional standards.

Failure to adhere to those standards will not be tolerated and will be dealt with swiftly and in accordance with the law. We ask that the community continue to place its trust and confidence in our organization as the actions of Mr. Coppock are not reflective of the other men and women of the Baytown Police Department who don the badge and uniform every day and proudly serve with integrity and honor.

(Issued in 2013)

The Baytown Police Department takes allegations of wrongdoing or misconduct by our officers very seriously. The trust and confidence of our community is paramount and as such we hold our officers to the highest levels of integrity as well as moral, ethical and professional standards. Failure to adhere to those standards will not be tolerated and will be dealt with in accordance with our departmental policies and the law.

As such, an investigation into this incident has been initiated and the Officer in question has been placed on Administrative Leave with Pay pending the outcome of the investigation. We ask that the community continue to place its trust and confidence in our organization and the men and women of the Baytown Police Department who don the badge and uniform every day and proudly serve with integrity, honor and professionalism.

(Issued 2018)

The Baytown Police Department takes allegations of wrongdoing or misconduct by our officers very seriously. The trust and confidence of our community is paramount and as such we hold our officers to the highest levels of integrity as well as moral, ethical and professional standards. Failure to adhere to those standards will not be tolerated and will be dealt with in accordance with the law. We ask that the community continue to place its trust and confidence in our organization and the men and women of the Baytown Police Department who don the badge and uniform every day and proudly serve with honor, integrity and professionalism.

(Issued in 2020)

163.    The immediate issuance of false and/or misleading statements that contain boilerplate promises of integrity and accountability are intended to coverup wrongdoing,

discourage police complaints, discourage oversight, discourage litigation, and discourage accountability.

**T.** **CITY'S indemnification and litigation strategy encourages unlawful force without consequence for CITY.**

164.    In the event that litigation results, CITY forewarns Plaintiffs that the CITY will present its written policies and training records to the Court as evidence that it does not maintain a policy/practice of permitting or tolerating the use of unlawful force, and as a result, the claims against the CITY will be dismissed.

165.    CITY further warns that while it will defend the involved officer(s), pursuant to civil service laws, it will exercise its right not to indemnify the involved officer(s).

166.    CITY will then encourage Plaintiff to settle immediately for the cost of defense, and caution Plaintiffs that continued litigation will simply decrease the amount available later for settlement.

167.    Realizing they are essentially untouchable, this strategy encourages both CITY and officers to act with reckless disregard for the civil rights of citizens.

168.    CITY'S strategy is intended to avoid oversight and accountability for officers and CITY.

169.    CITY'S strategy is not intended to protect civil rights and promote justice.

170.    CITY'S strategy encourages officers to act unlawfully and with impunity.

171.    While numerous officers have been indicted, the CITY has not terminated their employment.

172.    While the above incidents may sound few in number, CITY is believed to only employ approximately 150 officers.

## COUNT I

**Plaintiffs v. DE LA CRUZ**
**Fourth Amendment (Excessive Force)**
**Pursuant to 42 U.S.C. § 1983**

173.    Paragraphs 1-172 are incorporated herein by reference.

174.    The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

175.    The right to be free from excessive force during a seizure is clearly established. Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012).

176.    Claims that a police officer used excessive force are analyzed under an "objective reasonableness" standard. See Graham v. Connor, 490 U.S. 386, 388 (1989).

177.    To state a Fourth Amendment claim of excessive force, a Plaintiff must establish that (1) she was seized, (2) she suffered an injury (3) the injury resulted directly from a use of force, and (4) the force used was objectively unreasonable. Flores, 381 F.3d at 396; Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005); Bush v. Strain, 513 F.3d 492, 500-01 (5th Cir. 2008).

178.    In the Fifth Circuit, the excessive force inquiry is limited in scope to whether the officer or other persons were in danger at the moment when they used the force. Harris v. Serpas, 745 F.3d 767, 772 (5th Cir. 2014).

179.    DE LA CRUZ'S immediate resort to significant and then deadly force violated clearly established law.

180.    DE LA CRUZ used deadly force against TURNER who did not present as a credible threat of causing serious injury or death. See e.g., Christopher Cantu v. City of Dothan, Alabama, 974 F.3d 1217 (11th Cir. 2020) ("Woodruff knew the taser was in drive stun mode.

Knowing that, a reasonable officer in her position would also have known that if Lawrence had gotten control of the taser and used it against Rhodes it was unlikely to incapacitate him.").

181.    An objectively reasonable police officer, i.e., a police officer acting in accordance with state and federal law, and local and national training standards, would have known that using deadly force against a person who does not present as a credible threat of causing serious injury or death would violate clearly established law.

182.    As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

183.    Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT II

### Plaintiffs v. Defendant CITY and CYPRESS POINT
### Fourth and Fourteenth Amendments—Municipal Liability
### Pursuant to 42 U.S.C. § 1983

184.    Paragraphs 1-172 are incorporated herein by reference.

185.    "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

186.    In addition, a failure to train may give rise to municipal liability if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Canton v. Harris, 489 U.S. 378, 388 (1989).

187.    A private citizen can be held to be a state actor if they are "involved in a conspiracy or participate in joint activity with state actors." Ballard v. Wall, 413 F.3d 510, 518 (5th Cir. 2018).

188.    "[D]eciding whether deprivation of a protected right is fairly attributable to the State 'begins by identifying the specific conduct of which the plaintiff complains.'" Cornish v. Corr. Servs. Corp., 402 F.3d 545, 550 (5th Cir. 2005).

189.    To determine an officer's status when an incident occurs, courts look to "in what capacity was the officer acting at the time he committed the acts for which the complaint was made." Blackwell v. Harris County, 909 S.W.2d 135, 129 (Tex.App. – Houston [14th Dist.] 1995, writ denied).

190.    When DE LA CRUZ went to TURNER'S apartment to harass and threaten to evict TURNER on behalf of CYPRESS POINT (when he identified himself as a police officer but was not enforcing an eviction order), DE LA CRUZ was not serving a public duty; rather, he was unlawfully using his police powers to violate TURNER'S rights under the ADA and the Fair Housing Act.

191.    As previously discussed, DE LA CRUZ agreed to engage in this unlawful conduct at the request of CYPRESS POINT.

192.    CITY and CYPRESS POINT knowingly failed to maintain policies, practices, and training that met the minimum standards in the industry.

193.    As discussed herein, CITY and CYPRESS POINT maintained policies, practices, and customs, which were the moving force that resulted in TURNER'S constitutional rights being violated.

194.    In the alternative, CITY and CYPRESS POINT failed to implement proper policies and training, as discussed herein, which was the moving force that resulted in TURNER'S

constitutional rights being violated.

195.    As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

196.    Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT III

### Plaintiffs v. Defendant CITY and CYPRESS POINT
### Violations of Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.,
### and Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq.

197.    Paragraphs 1-172 are incorporated herein by reference.

198.    The Brixton Apartments has significantly more than five apartments available for rent and the owner of the complex does not live at the complex.

199.    As such, The Brixton Apartments meets the definition of a "public accommodation." See 42 U.S.C. §12181(7)(A).

200.    Titles II and III of the Americans with Disabilities Act prohibit discrimination on the basis of disability in all programs, services, and activities of public entities, and require landlords to make rental spaces and common areas accessible for anyone with a disability so they can access the property equally.

201.    The prima facie cases for compensatory claims brought pursuant to § 504 of the RA, and ADA, are identical.

202.    To state a claim under the ADA and § 504 of the RA, a Plaintiff must allege that she (1) is disabled, (2) is otherwise qualified for the service, program, or activity of the entity, and

(3) was discriminated against in that service, program, or activity solely on the basis of her disability.

203.     A disability is defined as (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarded as having such an impairment.

204.     A Plaintiff can establish a violation of the ADA pursuant to three theories: (1) disparate treatment, (2) disparate impact, and/or (3) failure to provide a reasonable accommodation. See Quality of Life, Corp. v. City of Margate, No. 18-14443 (11th Cir. 2020); Palm Partners, LLC v. City of Oakland Park, No. 1:14-CV-21242-KMM, 2015 WL 1968799, at *6 (S.D. Fla. Apr. 30, 2015).

205.     CITY and CYPRESS POINT knew that TURNER suffered from a qualifying mental disability.

206.     CYPRESS POINT engaged in disparate treatment – intentional discrimination against TURNER solely because of her disability.

207.     CYPRESS POINT denied TURNER access to the office because of her disability.

208.     CITY and CYPRESS POINT denied TURNER continued access to the parking lot, hallway, and her rental unit because of her disability.

209.     CYPRESS POINT threatened to evict TURNER from the property because of her disability.

210.     CYPRESS POINT evicted TURNER from the property because of her disability.

211.     CYPRESS POINT and DE LA CRUZ agreed that DE LA CRUZ would serve the low-level warrants on TURNER on the same date that the eviction notice was served, so that the eviction could be accomplished.

212.    This way, TURNER would be placed in jail instead of being forced into homelessness.

213.    While service of a valid arrest warrant is generally a lawful activity, selective enforcement of the law for the sole purpose of discriminating against a mentally ill person because of their disability, is not.

214.    CITY knew that its officers would routinely encounter persons with mental health disabilities.

215.    CITY knew that officers would routinely engage in warrant service.

216.    CITY, however, failed to train its officers and implement policy directing that despite the Fifth Circuit's holding in Hainze v. Richards, 207 F.3d 795, 800-01 (5th Cir. 2000), i.e., that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents . . . prior to the officer's securing the scene and ensuring that there is no threat to human life[,]" the ADA applies when an officer knows of and has time to plan to accommodate a mental health disability.

217.    CITY failed to train its officers and implement policy directing that the discretionary service of warrants may not be used as a means of addressing behavior resulting from mental disabilities or as a means to assist in the eviction of a mentally ill person.

218.    DE LA CRUZ as an employee of the CITY exercised his discretion to effect an arrest that he would not have otherwise effected had TURNER not suffered from a disability.

219.    Despite knowing that TURNER required reasonable accommodation to policy and procedure to address her mental health disability, including but not limited to, having a mental health professional and/or backup officer respond with the officer, or scheduling a time to

surrender herself to the court, CITY failed to implement policy and training that provided for such accommodations.

220.    As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

221.    Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

**COUNT IV**

**Plaintiffs v. Defendant CYPRESS POINT**
**Violations of The Fair Housing Act of 1968,**
**as amended .S. Code §§ 3601-3619 and 3631**

222.    Paragraphs 1-172 are incorporated herein by reference.

223.    The Fair Housing Act of 1968, as amended 42 U.S. Code §§ 3601-3619 and 3631, specifically prohibits housing discrimination on the following grounds: race, religion, ethnic background or national origin, sex, familial status, or physical or mental disability.

224.    A Plaintiff can establish a violation of the Fair Housing Act ("FHA") pursuant to three theories: (1) disparate treatment, (2) disparate impact, and (3) failure to provide a reasonable accommodation. See Quality of Life, Corp. v. City of Margate, No. 18-14443 (11th Cir. 2020); Palm Partners, LLC v. City of Oakland Park, No. 1:14-CV-21242-KMM, 2015 WL 1968799, at *6 (S.D. Fla. Apr. 30, 2015).

225.    CYPRESS POINT knew that TURNER suffered from a mental disability.

226.    CYPRESS POINT engaged in disparate treatment – intentional discrimination against TURNER solely because of her disability.

227.    CYPRESS POINT denied TURNER access to the office because of her disability.

228.    Both the CITY and CYPRESS POINT denied TURNER continued access to the parking lot, hallway, and her rental unit because of her disability.

229.    CYPRESS POINT threatened to evict TURNER from the property because of her disability.

230.    CYPRESS POINT evicted TURNER from the property because of her disability.

231.    CYPRESS POINT and DE LA CRUZ agreed that DE LA CRUZ would serve the low-level warrants on TURNER on the same date that the eviction notice was served, so that the eviction could be accomplished.

232.    This way, TURNER would be placed in jail instead of being forced into homelessness.

233.    While service of a valid arrest warrant is generally a lawful activity, selective enforcement of the law for the sole purpose of discriminating against a mentally ill person because of their disability, is not.

234.    As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

235.    Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

### COUNT V

**Plaintiffs v. Defendants**
***(excluding DE LA CRUZ in his individual capacity)***
**Survival Claim**
**Pursuant to Texas State Law**

236.    Paragraphs 1-172 are incorporated herein by reference.

237.    TURNER'S claims in life, asserted herein, survive her death.

238.     As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

239.     Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

## COUNT VI

**Plaintiffs v. Defendants**
***(excluding DE LA CRUZ in his individual capacity)***
**Wrongful Death Claim**
**Pursuant to Texas State Law**

240.     Paragraphs 1-172 are incorporated herein by reference.

241.     Plaintiffs asserts this claim on behalf of TURNER'S survivors.

242.     Plaintiffs seeks all damages available by law for each of the survivors.

243.     As a direct and proximate cause of the Defendants' conduct, TURNER suffered humiliation, fear, emotional injuries, pain, physical injuries, and death.

244.     Plaintiffs respectfully demand the following relief: declaratory, compensatory, and punitive damages; attorneys' fees, litigation costs, interest, and any other relief available pursuant to state and federal law.

**WHEREFORE**, Plaintiffs respectfully requests that judgment be entered in their favor as follows:

A.     **Declaratory Judgment:** Providing that the Defendants' individual and collective conduct violated Plaintiffs' rights;

B.     **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: violations of legal rights, emotional distress, emotional injury, fear, pain and suffering, physical injury, continuing injury, permanent injury, and loss of life (hedonic

damages);

    C.      **Punitive damages** as permitted by law;

    D.      **Pre and Post Judgment Interest** as permitted by law;

    E.      **Equitable Relief:** A written admission of the allegations stated in the Complaint,

an in-person oral apology, and a written admission of wrongdoing and apology;

    F.      **Attorney's Fees, Costs, and Interest:** As permitted by law; and

    G.      **Discretionary Damages and Relief:** Such other financial or equitable relief that

the Court deems reasonable and just.

## Jury Trial Demand

Plaintiffs respectfully request a trial by jury on all claims/issues in this matter that may be

tried to a jury.

**Respectfully Submitted,**

**s/ *Devon M. Jacob***                           **Date: December 14, 2021**
**DEVON M. JACOB, ESQUIRE**
PA Bar Number: 89182
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Plaintiffs' Counsel)

**s/ *Benjamin L. Crump***                        **Date: December 14, 2021**
**BENJAMIN L. CRUMP, ESQUIRE**
FL Bar Number: 72583
**BEN CRUMP LAW, PLLC**
122 S. Calhoun Street, Tallahassee, Florida 32301
(850) 224-2023 | court@bencrump.com
(Plaintiffs' Counsel)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS (Houston Division)**

| | |
|---|---|
| **CHELSIE CIERRA RUBIN, et al.,** | **No. 4:21-cv-1148** |
| **Plaintiffs,** | **District Judge: George C. Hanks, Jr.** |
| | **Magistrate Judge: Andrew M. Edison** |
| **v.** | |
| | **CIVIL ACTION – LAW** |
| **JUAN PEDRO DE LA CRUZ, et al.,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I, Devon M. Jacob, Esquire, hereby certify that on the below referenced date, I caused a true and correct copy of this document to be served, via ECF, on all counsel of record.

**Respectfully Submitted,**

**s/ *Devon M. Jacob***                            **Date: December 14, 2021**
**DEVON M. JACOB, ESQUIRE**