UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CHELSIE CIERRA RUBIN, *et al.*, § | |
|     Plaintiffs, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:21-CV-01148 |
| § | |
| JUAN PEDRO DE LA CRUZ, *et al.*, § | |
|     Defendants. § | |

## **MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendants City of Baytown's ("City") and Juan Pedro De La Cruz's motions for summary judgment. (Dkts. 72, 74). After carefully reviewing the motions, responses, replies, applicable law, and the entire record, the motions are **GRANTED**.

### I.    FACTUAL BACKGROUND

This case arises from the death of Pamela Turner ("Turner"). Juan Pedro De La Cruz ("De La Cruz"), a Baytown Police Officer, lived at the Brixton Apartment Complex in Baytown, Texas where he also served as the courtesy law enforcement officer. On May 13, 2019, De La Cruz was on duty as a Baytown Police Officer. During the evening, he took his meal break at the apartment complex. As he was leaving to respond to a call from dispatch, De La Cruz saw Turner who also lived at the complex. De La Cruz testified that she was disturbing the peace by screaming in the middle of the parking lot. De La Cruz was acquainted with Turner due to prior disturbances involving Turner and the managers

and residents at the complex. De La Cruz knew that Turner had been previously arrested and accused of making threats to people, suffered from a mental illness and mental health issues, and was aggressive. De La Cruz had also previously attempted to get medical help for Turner by calling Turner's daughter.

As he was leaving, De La Cruz queried Turner's name on his police database computer and found that Turner had three active Class B misdemeanor warrants for her arrest. After completing the dispatched call, at about 10:40 pm De La Cruz drove back to the complex to arrest Turner on the outstanding warrants if she was still outside her apartment. As he entered the complex, he saw Turner walking alongside the border of the property. De La Cruz attempted to contact Turner by exiting his patrol vehicle to inform her of the active warrants. Turner disregarded him, circling around his vehicle and continuing to walk into the complex parking lot. De La Cruz returned to his vehicle and used it to block her path.

De La Cruz exited his vehicle and again tried to inform Turner about the arrest warrants. De La Cruz initially told Turner she had active warrants and instructed her to stop. Turner said "No," told De La Cruz that he was harassing her and tried to walk away. De La Cruz then reached to grab hold of Turner's arm. Much of what happened next was captured on De La Cruz's body camera footage and in a Facebook video.[1] (Dkts. 74-3; 74-

---

[1] *See Walker v. City of Houston*, No. 22-20537, 2023 WL 6457926, at *3 (5th Cir. Oct. 4, 2023) ("Although we view the evidence favorably to the nonmovant, we nevertheless 'assign greater weight, even at the summary judgment stage, to the ... video recording[ ] taken at the scene.'") (quoting *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022)).

8.) As he holds onto Turner's arm, De La Cruz says, "I don't want to hurt you" and reaches for his handcuffs. As De La Cruz tries to handcuff and arrest Turner, she pulls away from him walking backwards, and he follows her. De La Cruz instructs Turner to "Stop," but Turner continues to move away from him.

De La Cruz deploys his X26P taser on Turner in probe-deployment or "prong" mode, which is designed to temporarily incapacitate a person from a safer distance. While the taser does not appear to incapacitate Turner, she falls backward and lands on the sidewalk and grass adjacent to the parking lot. De La Cruz bends down and attempts to deploy his taser in drive/stun mode (i.e., a contact tase). As he attempts to use the taser again, Turner continues to physically resist De La Cruz, and he instructs her to "Stop."

During the struggle, Turner takes the taser from De La Cruz's hand and tases him in the testicle area.[2] De La Cruz then steps back about three feet and fires his weapon five times, striking Turner with three of the bullets. She died at the scene. The videos establish that at the moment she was shot, Turner was facing towards De La Cruz with his taser in her hands; the taser wires were extending from the taser and were attached to De La Cruz.[3]

---

[2] Plaintiffs' assertion in their briefing that De La Cruz "accidentally tased himself" while attempting to arrest Turner is not established by the summary judgment evidence in the record. Furthermore, even if this assertion was established by the record, it would not change the Court's analysis of Plaintiffs' claims in this case. *See* discussion *infra*.

[3] The videos are consistent with De La Cruz's sworn testimony regarding the incident.

APPLICABLE LAW

A.     **Summary Judgment Standard**

Under Federal Rule of Civil Procedure Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). A fact is material if "its resolution could affect the outcome of the action." *Nunley v. City of Waco*, 440 F. App'x 275, 277 (5th Cir. 2011). The court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). The Court does not, however, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts to survive summary judgment." *Salazar-Limon v. City of Houston*, 826 F.3d 272, 277 (5th Cir. 2016), as revised (June 16, 2016) (internal quotation marks and citation omitted).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating . . . that there is an issue of material fact warranting trial." *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). If the movant produces evidence that

tends to show that there is no dispute of material fact, the nonmovant must then identify evidence in the record sufficient to establish the dispute of material fact for trial. *Celotex*, 477 U.S. at 321–23. The nonmovant must "go beyond the pleadings and by her own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001) (citing *Celotex*, 477 U.S. at 324). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertion, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, L.L.C.*, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).

## II. ANALYSIS

The Plaintiffs in this action are Turner's daughter and son. They assert an excessive force claim against De La Cruz under the Fourth Amendment. They also assert claims against the City of Baytown under state law, the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. ("Section 504").

### B. Excessive Force

#### a. Qualified Immunity

In his pending motion De La Cruz asserts the defense of qualified immunity to this action. In civil rights actions in which the non-movant is suing a government official, the issue of qualified immunity alters the summary judgment analysis. *Brown v. Callahan*, 623

F.3d 249, 253 (5th Cir. 2010). If the defense of qualified immunity is raised, the burden shifts to the non-movant to rebut it. *Id*. All inferences are still drawn in the non-movant's favor. *Id*.

"The qualified immunity defense has two prongs: whether an official's conduct violated a statutory or constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Id*. For the right to have been clearly established for purposes of qualified immunity, the contours of the right must have been sufficiently clear that a reasonable official would have understood that what he was doing violated that right. *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008). The unlawfulness of the official's actions must have been readily apparent from sufficiently similar situations, though there need not have been commanding precedent holding the very action in question unlawful. *Id*. at 236–37. The first prong of the qualified immunity analysis is governed by current law, while the second prong is governed by the law as it was clearly established at the time of the conduct in question. *Petta v. Rivera*, 143 F.3d 895, 899–900 (5th Cir. 1998). The legal standards can, and sometimes will, conflict, but both prongs must be satisfied. *Id*.

Qualified immunity "establishes a high bar"—*Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013)—that protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Essentially, a plaintiff must demonstrate that no reasonable official could have believed that his actions were proper. *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).

### b. Constitutional Violation

Starting with the first prong of the qualified immunity analysis, the Court considers, viewing the facts in the light most favorable to Plaintiffs, whether De La Cruz's actions during his attempted arrest of Turner violated Turner's Fourth Amendment rights. Specifically, the Court evaluates whether De La Cruz violated Turner's Fourth Amendment rights when he (a) tased Turner and (b) used deadly force by shooting and killing Turner.

The Fourth Amendment guarantees the right to be free from excessive force during an arrest. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). To succeed on the merits of a Fourth Amendment claim, "a plaintiff must demonstrate (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Jackson v. Gautreaux*, 3 F.4th 182, 186 (5th Cir. 2021) (quoting *Hutcheson v. Dallas County*, 994 F.3d 477, 480 (5th Cir. 2021)).

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In assessing the reasonableness of the officers' actions, the courts look to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396. Courts also "consider 'the relationship between the need [for force] and the amount of force used.'" *Betts v. Brennan*,

22 F.4th 577, 582 (5th Cir. 2022) (alterations in original). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

In this case, De La Cruz was attempting to arrest Turner because she had three Class B misdemeanor warrants. These are minor offenses mitigating against the use of force. *See Reyes v. Bridgwater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010) (finding the "severity" factor from *Graham* mitigated against a use of force where the alleged crime was a misdemeanor). However, the other two *Graham* factors demonstrate that De La Cruz's actions were reasonable.

Plaintiffs do not appear to contest that De La Cruz's deployment of his taser in "prong" mode was not a constitutional violation. (*See generally* Dkt. 82.) Nonetheless, the Court, having reviewed the record in the light most favorable to the non-movant, finds that De La Cruz did not violate Turner's Fourth Amendment right to be free from excessive force when he tased her. "Where a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him." *Cloud v. Stone*, 993 F.3d 379, 385 (5th Cir. 2021) (brackets omitted). De La Cruz was the only officer on the scene, and Turner's active resistance in pulling away from De La Cruz, turning around to face him, and struggling against De La Cruz as he attempted to handcuff her also created some threat to his safety. *See Betts*, 22 F.4th at 582 ("Brennan was the lone officer on the scene, and Betts's persistently confrontational manner created some threat to the officer's safety."); *Cloud,* 993 F.3d at 385 (finding officer had reasonable

grounds to tase Cloud where Cloud turned around in the midst of being handcuffed as Cloud "took a confrontational stance, deprived [the officer] of the use of his handcuffs, and thwarted efforts to complete the arrest").

De La Cruz also did not immediately use the taser; he spoke to Turner, issued commands, grasped Turner's arm, and attempted to handcuff her first. "Only when all those lesser options appeared to have failed did [De La Cruz] use his taser." *See Betts*, 22 F.4th at 584. This establishes that De La Cruz responded with "measured and ascending" actions that corresponded to Turner's "escalating verbal and physical resistance." *See Poole*, 691 F.3d at 629; *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 182 (5th Cir. 2016) (finding deputies' use of tasers not clearly excessive or unreasonable where deputies did not deploy tasers until after the individual had "continuously failed to comply").

Likewise, De La Cruz's attempt to execute a drive-stun tase was not unreasonable because the first tase did not appear to be effective. This is evidenced by the fact that Turner continued to ignore De La Cruz's commands and struggle against him as he tried to arrest her. "Under these circumstances, [De La Cruz's] continued force to complete the arrest, like his initial tase, was reasonable." *See Cloud*, 993 F.3d at 387; *id.* at 386 ("Because [the officer's] initial tase had no effect, however, the circumstances justifying force were still present during the drive-stun tasing. Plaintiffs have not pointed to evidence that Cloud complied with any commands or ceased to resist arrest after the first tase.").

The Court also finds that De La Cruz did not violate Turner's Fourth Amendment right to be free from excessive force when he used deadly force against her. "An officer's

use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016) (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)). This "inquiry is confined to whether the officer or another person was in danger *at the moment of the threat* that resulted in the officer's use of deadly force." *Salazar-Limon v. City of Houston*, 826 F.3d 272, 278 (5th Cir. 2016), as revised (June 16, 2016) (brackets omitted) (quoting *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011)).

At the time he discharged his weapon, De La Cruz was the sole officer in a confrontation at night with a person who was actively resisting arrest and refusing to comply with the officer's verbal commands, who had taken control of De La Cruz's taser during a struggle, whom De La Cruz observed to be sitting upright and/or attempting to stand up, and who was now facing towards him with his taser in her hand while the taser wires were attached to him. Regardless of whether Turner tased him in the seconds before he began shooting, or as Plaintiffs have suggested, De La Cruz tased himself, under these circumstances, at that moment a competent officer could have reasonably believed that Turner posed a threat of serious harm to his life. Specifically, a competent officer could have reasonably believed that Turner could use the taser to incapacitate or disarm him and take his life.

Plaintiffs argue that De La Cruz did not have "probable cause to believe that Turner presented as a serious or deadly threat when he used the deadly force" (Dkt. 82 at 17

(emphasis omitted)) because he knew from his training that the taser in Turner's hand—which had already been used in "prong" mode and therefore could only be used in "drive-stun" mode—could only cause temporary localized pain, not incapacitation. (*See* Dkt. 82 at 14–15.) In support of this argument Plaintiffs cite the taser manual and the City of Baytown Police Department's General Order on Use of Force, which states that use of electronic weapons "is not likely to cause any injury." (Dkt. 82 at 4; Dkt. 82-3 at 4.) Plaintiffs also cite their expert's report,[4] which states, in part, that De La Cruz's "use of deadly force on someone who did not pose a significant threat of death or serious bodily injury to himself or others at the time also violated [Baytown Police] policies and [generally accepted law enforcement] training standards." (Dkt. 82 at 22; Dkt. 82-4 at 8.) The Court finds this argument unpersuasive.

Plaintiffs' argument ignores the totality of the facts in this case establishing that a reasonable officer could have perceived Turner as an immediate and grave threat to the officer's safety. Under the facts established by the summary judgment evidence, a competent officer could have reasonably believed that the alleged temporary localized pain from a taser –while not "likely" to cause "injury" – could nevertheless distract him or otherwise lead to the suspect gaining control of his service weapon and ending his life. A competent officer could have also reasonably believed that he needed to act quickly to secure his safety.

---

[4] In reaching its decision, the Court has given Plaintiffs' expert's testimony due consideration, and it denies De La Cruz's Motion to Exclude, or Alternatively Limit, Testimony of Dr. Roy G. Taylor (Dkt. 81).

Furthermore, any expert testimony about De La Cruz's training does not overcome his assertion of qualified immunity where as here, a reasonable officer could have believed his actions were justified: "Even if an officer acts contrary to her training . . . that does not itself negate qualified immunity where it would otherwise be warranted. Rather, so long as 'a reasonable officer could have believed that his conduct was justified,' a plaintiff cannot 'avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.'" *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 616 (2015) (alteration in original).

Next Plaintiffs argue that De La Cruz used excessive force because he "did not use deadly force until *after* he had already backed out of Turner's reach and while she was still seated on the ground" (*i.e.*, that De La Cruz shot Turner while he was out of range of the taser) and that he could have warned Turner that he intended to use deadly force but did not do so. (Dkt. 82 at 14–15.) The Court also finds this argument unpersuasive.

The summary judgment evidence does not establish that De La Cruz was clearly beyond Turner's ability to harm him when she was shot. At the time Turner was shot, the taser wires were still attached to De La Cruz and he had only been moving away for two seconds when he fired the first shot. Under these facts, a reasonable officer could have perceived Turner as an immediate and grave threat to the officer's safety once she had his taser in her hand and was sitting up and/or attempting to get up of the ground. De La Cruz did not have the luxury in that moment to negotiate with the individual holding his taser

who up to this point had been struggling with him and was consistently nonresponsive to his verbal commands. *See Harmon v. City of Arlington*, Texas, 16 F.4th 1159, 1165 (5th Cir. 2021). A competent officer could have believed he needed to act quickly to secure his safety. "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others.'" *Sheehan*, 575 U.S. at 612. "This is true even when, judged with the benefit of hindsight, the officers may have made 'some mistakes.'" *Id.* The Court thus "cannot conclude that the speed with which he resorted to force impairs the reasonableness of [De La Cruz's] actions." *See Harmon*, 16 F.4th at 1165.

Finally, Plaintiff argues that De La Cruz's use of deadly force is unreasonable because De La Cruz could have dealt with the situation in another way so as to avoid the need to use deadly force. The Court finds this argument unpersuasive. The Fifth Circuit has not "condone[d] an open-ended inquiry into every alternative course of action—such an inquiry is inimical to established qualified immunity doctrine." *Id.*

Accordingly, the Court finds that De La Cruz did not violate Turner's Fourth Amendment rights when he deployed his taser or when he shot and killed Turner.

### c. Clearly Established Law

As Plaintiffs' excessive force claim falls at the first prong of qualified immunity, the Court need not consider the second prong in detail. The "clearly established inquiry is demanding, especially in claims for excessive force." *Id.* at 1167. "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and

thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

Here, the Plaintiffs failed to identify any clearly established law "that would place beyond doubt the constitutional question in this case," *i.e.*, whether it is unreasonable for an officer to tase a person who is actively resisting arrest and presents at least some threat to the officer and whether it is unreasonable for an officer to use deadly force when he has been tased, the taser's wires are attached to him, and the person who has been actively resisting arrest is attempting to rise from the ground with his taser in hand. *See Harmon*, 16 F.4th at 1167.

C.      **ADA & Section 504**

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). With regard to public entities, Congress intended that Title II "work in the same manner as Section 504," and jurisprudence interpreting either statute is

generally applicable to both. *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (citations omitted).

A disabled plaintiff can succeed in an action under the Title II and Section 504 if she can show that, by reason of her disability, she was either excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was otherwise "subjected to discrimination by any such entity." *Id.* at 799 (quotations omitted). Plaintiffs "can only recover damages under the ADA or § 504 upon a showing of intentional discrimination." *J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023). However, the ADA "does not apply to an officer's on-the-street responses to ... incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Allen v. Hays*, 65 F.4th 736, 752 (5th Cir. 2023) (omission in original).

For example, in *Allen*, a "58-year-old veteran known to the Houston Police Department ('HPD') for his documented history of PTSD" was stopped by two HPD officers "for a routine traffic stop." *Id.* at 741–742. During the stop, the first officer heard Allen state that he was going to reach for his wallet. *Id.* at 742. On the passenger side, the second officer "instructed Allen to stop moving, to stop reaching, and to remove his foot from the gas pedal. [That officer] had a taser in his pocket but did not use it. Instead, within seconds and without further warning, [the second officer] leaned across [the person in the passenger seat] and fired six shots, hitting Allen five times at point-blank range." *Id.* The Fifth Circuit explained that "the law in this circuit is unequivocal: The ADA 'does not

apply to an officer's on-the-street responses to ... incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life.'" *Id.* at 752 (omission in original) (quoting *Hainze*, 207 F.3d at 801). It "thus affirm[ed] dismissal" of the ADA claims against the City of Houston. *Allen*, 65 F.4th at 752.

Here, even if De La Cruz was acquainted with Turner, knew from prior involvement with Turner that Turner suffered from a mental illness, suffered from mental health issues, and was aggressive, and previously attempted to get medical help for Turner by calling Turner's daughter, the ADA and Section 504 do not apply, just as the ADA did not apply in *Allen* where the driver's PTSD was known to the police department. *See Allen*, 65 F.4th at 741. Like the officers in *Allen*, De La Cruz was executing a routine, on-the-street response to an incident when he attempted to arrest Turner pursuant to warrants when he saw her in the entrance of the apartment complex as he entered the complex.

Plaintiffs argue that *Allen* is distinguishable from the case at hand because there was "no exigency or even need to make contact with Turner when De La Cruz chose to do so"; "De La Cruz knew who he would be dealing with before he made contact"; and "De La Cruz had an opportunity to plan the contact before it began." (Dkt. 83 at 17.) The Court disagrees. The Court notes that there was no exigency when the police officers in *Allen* executed the routine traffic stop. And Plaintiff is unable to cite any caselaw supporting their theory that the factual distinctions they posit are significant such that ADA and Section 504 should apply in a context similar to this one. *See Austin v. City of Pasadena,*

*Texas*, 74 F.4th 312, 334 (5th Cir. 2023) ("Plaintiffs cite to no binding caselaw in which liability under the ADA and [Rehabilitation Act] has been extended to a context similar to this one. Because they do not make a compelling case for doing so here, we consequently affirm the district court's grant of summary judgment.")

Moreover, Plaintiffs have not established the elements of a successful claim under the ADA or Section 504 and have also not established intentionality. *See J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023) (listing elements of prima facie case under ADA and Section 504).

Thus, Plaintiffs' ADA and Section 504 claims are dismissed.

## IV. SUPPLEMENTAL JURISDICTION

Having dismissed all federal causes of action in this case, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims. Federal district courts have the discretion to decline to exercise supplemental jurisdiction over state-law claims; that discretion is guided by the statutory factors set forth in 28 U.S.C. § 1367(c) and the common-law factors of judicial economy, convenience, fairness, and comity. *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008).

The factors listed in 28 U.S.C. § 1367(c) are:

> (1) the claim raises a novel or complex issue of State law;
> 
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;

(3) the district court has dismissed all claims over which it has original jurisdiction; or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

"These interests are to be considered on a case-by-case basis, and no single factor is dispositive." *Mendoza*, 532 F.3d at 346. The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial. *Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).

Having considered the statutory and common-law factors, the Court will follow the general rule, decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims, and dismiss Plaintiffs' state-law claims without prejudice.

## V.     CONCLUSION

The motions for summary judgment filed by City of Baytown and Juan Pedro De La Cruz are **GRANTED**. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims, and Plaintiffs' state-law claims are **DISMISSED WITHOUT PREJUDICE**.

SIGNED at Houston, Texas on December 12, 2023.

*George C. Hanks Jr.*
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE